| | |
|---|---|
| VERNON LEE ANDERSON, SR., *et al.*, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 09-cv-227-JPG |
| v. | |
| DIANE L. HACKETT, executor of the ESTATE OF PAUL SAUGET, deceased, *et al.*, | |
| Defendants. | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiffs's Motion to Remand (Doc. 21).

Defendant Cerro Flow Products, Inc. has responded (Doc. 26), as have Defendants Pharmacia

Corporation, Solutia, Inc., Pfizer, Inc., and Monsanto AG Products, LLC (Doc. 27), and

Defendant Diane L. Hackett, executor of the estate of Paul Sauget (Doc. 28).  Plaintiffs have

replied (Docs. 33 and 34).  Also before the Court is Plaintiffs's Motion for Oral Argument on the

Motion to Remand (Doc. 35) to which Defendants have responded (Doc. 36).  The Court finds

that oral argument on this matter is unnecessary, and **DENIES** the Motion for Oral Argument.

For the Following reasons, the Court **GRANTS** the Motion for Remand.

## BACKGROUND

Plaintiffs filed this putative class action in the Circuit Court of St. Clair County, Illinois,

alleging that Defendants released hazardous substances from release sites in St. Clair County

into the environment in and around the Village of Sauget, Illinois.  Plaintiffs seek relief in the

form of medical monitoring for themselves and "tens of thousands" of class members.  Plaintiffs

also seek injunctive relief and a monetary judgment in an amount necessary to cover

investigation, assessment, remediation and removal of all traces of hazardous substances released into the environment. Defendants removed the action to this Court asserting federal jurisdiction based on the Class Action Fairness Act of 2005 (CAFA), Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). Alternatively, Defendants assert the Court has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because they are being sued for actions they took while acting under color of federal office. Plaintiffs now move to remand, arguing that this case fits within the "local controversy" exception to CAFA. Plaintiffs also argue that Defendants are not entitled to assert federal officer removal.

## I.       Citizenship of the Parties

The named Plaintiffs are all Illinois citizens. In addition, the classes that the named Plaintiffs purport to represent are comprised entirely of Illinois citizens. For purposes of this motion, Defendant Diane L. Hackett, as executor of the estate of Paul Sauget, who was the sole shareholder of the now-dissolved Sauget & Co. (the Sauget Defendants) is an Illinois citizen. Defendant Cerro Flow Products, Inc. (Cerro) is also a citizen of the state of Illinois for purposes of this motion. Finally, for purposes of this motion, all other Defendants (the Monsanto Defendants)[1] are citizens of states other than Illinois.

## II.      Factual Allegations in Complaint

The releases of hazardous substances that form the basis of the Complaint took place at three release sites. The first is a 90-acre landfill operated by Sauget & Co. (Sauget Landfill). The second is the 314-acre W.G. Krummrich Plant, located at 500 Monsanto Avenue in Sauget,

---

[1]The remaining defendants are related or successor corporate entities collectively referred to in Plaintiffs's briefings as "the Monsanto Defendants." The Court will likewise refer to these defendants as the Monsanto Defendants.

Illinois, operated by one or more of the Monsanto Defendants (Monsanto Facility). The third release site is the property abutting the Monsanto Facility, located at 3000 Mississippi in Sauget, Illinois owned by Cerro Flow Products, Inc. (Cerro Facility).

Beginning in 1935, Defendants caused polychlorinated biphenyls (PCBs), dioxins, furans, and other hazardous substances to invade the ground, surface water, wastewater and atmosphere in and around the release sites. Cerro scrapped PCB transformers at the Cerro facility, drained manufacturing wastewater and PCB oil into Dead Creek Segment A located on the Cerro Facility, and landfilled hazardous substances on the Cerro Facility.

The Monsanto Defendants caused releases of hazardous substances via fugitive emissions from its manufacturing and packaging processes. Additionally, the Monsanto Defendants spilled hazardous substances onto the ground at the Monsanto Facility. The Monsanto Defendants also used, cleaned and stored leaking PCB transformers. They incompletely incinerated PCBs and improperly burned other hazardous substances. The Monsanto Defendants discharged hazardous substances into surface waters and wastewater systems. Finally, the Monsanto Defendants improperly disposed of hazardous substances in landfills, including those located on the Cerro Facility and the Sauget Landfill.

The Sauget Defendants engaged in, permitted, and even encouraged the disposal of millions of tons of hazardous substances into the Sauget Landfill.

**III.    Proposed Classes**

The proposed Medical Monitoring Class is:

Current Illinois citizens who reside or have resided within a two-mile radius of the Sauget Landfill, the Monsanto Facility or the Cerro Facility at any time since January 1, 1935.

The proposed Remediation Class is:

Current Illinois citizens who own real property within a two-mile radius of the Sauget Landfill, the Monsanto Facility or the Cerro Facility.

## IV. Factual Allegations in Notice of Removal

### A. Production History of Monsanto Defendants

From 1935 until 1977 the Monsanto Defendants produced PCBs at the W.G. Krummrich plant in Sauget, Illinois. In 1940, the Chemical Warfare Service (CWS), a part of the War Department (now the Defense Department), contracted with the Monsanto Defendants to build a chemical plant on land immediately to the north of the W.G. Krummrich plant. The new plant was to produce the chemical CC-2, also called "Impregnate II," a specialty chemical essential to the war effort. Within the next three years, the CWS contracted with Monsanto to build two more chemical plants, one to produce CC-2 and the other to produce dichloramine-T, also called DAT. The CWS directly controlled the three plants, but contracted out operation of the plants to the Monsanto Defendants. The Monsanto Defendants dumped the waste material from the CWS plants into dumpsters, which it then hauled to the Sauget Landfill. During the same time frame, the Monsanto Defendants also dumped waste from the W.G. Krummrich plant into the Sauget Landfill.

During the Vietnam War, between the years 1965 and 1968 or 1969, the Monsanto Defendants produced the herbicide known as Agent Orange at the direction of and for use by the Defense Department. As directed by the Defense Department, one component of Agent Orange was 2,4,5-T, a compound containing the hazardous chemical known as dioxin. 2,4,5-T was produced in West Virginia, but combined with the other ingredients of Agent Orange at the W.G. Krummrich plant in Sauget.

In the early 1970s, the Monsanto Defendants phased out production of PCBs for all but

4

enclosed electrical uses.  The Monsanto Defendants considered phasing out the production of

PCBs entirely, but representatives of the federal government urged the Monsanto Defendants to

continue the production and sale of PCBs for use in electrical transformers and capacitors,

issuing a report that warned that discontinuing the production and use of PCBs could cripple the

nation's power grid.  Accordingly, the Monsanto Defendants continued to produce PCBs at the

Krummrich plant until 1977.

### B.    Other Civil Actions Against the Monsanto Defendants

The Monsanto Defendants have been sued in Alabama, Florida and New York for

damages arising from alleged spills of hazardous substances in those states.  Additionally, on

March 13, 2007, a class action, styled *Corlew v. General Electric Co.*, was filed against the

Monsanto Defendants.  The plaintiffs in *Corlew* alleged that the Monsato Defendants

manufactured and provided General Electric (GE) with inherently dangerous products containing

PCBs.  The *Corlew* plaintiffs also alleged that the Monsanto Defendants failed to properly warn

GE as to the dangers of PCBs, and failed to properly instruct GE as to the safe use and disposal

of products containing PCBs.  GE then allegedly improperly used, maintained and disposed of

the PCB-containing products, resulting in the contamination of plaintiffs's property.

### ANALYSIS

A defendant may remove to federal court a case filed in state court if there is original

federal jurisdiction over the case.  28 U.S.C. § 1441(a);  *Chase v. Shop 'N Save Warehouse

Foods*, 110 F.3d 424, 427 (7th Cir. 1997).  In its § 1441 notice of removal the defendants assert

that the Court has original federal jurisdiction over this matter pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d).  In the alternative, Defendants contend that the Court has

jurisdiction and the case is removable pursuant to 28 U.S.C. 1442(a)(1), because a removing

defendant is being sued for actions taken at the direction of a federal official.

## I.    Class Action Fairness Act Jurisdiction

Pursuant to the Class Action Fairness Act (CAFA), federal courts have jurisdiction over class actions in which there is minimal diversity of citizenship and the amount in controversy in the aggregate exceeds five million dollars.  28 U.S.C. § 1332(d).  Removal of such class actions can be had at the election of any defendant to the class action with or without the consent of the other defendants.  28 U.S.C. § 1453.  The proponent of federal jurisdiction bears the burden of establishing federal jurisdiction under CAFA.  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447-48 (7th Cir. 2005).

While it is clear that there is minimal diversity of citizenship, Plaintiffs argue that Defendants have not established that more than five million dollars is in controversy.  "[T]he removing litigant must show a reasonable probability that the stakes exceed the minimum."  *Id*. at 448.  Here, Plaintiffs bring this action on behalf of "tens of thousands" of individuals asking for "periodic diagnostic medical examinations" for each of them to screen for injuries to "the brain and central nervous system, the peripheral nervous system, the kidneys, the liver, the immune system, the reproductive system, and the endocrine system."  Additionally, Plaintiffs seek remediation from Defendants in an amount sufficient to remove "all traces" of hazardous substances found in an environment alleged by Plaintiffs to have been repeatedly contaminated with various toxic chemicals for a period of over 70 years.  Frankly, the Court is at a loss as to how Plaintiffs can seriously argue, given the allegations in the Complaint and their requested relief, that the amount in controversy requirement is not met.  As Defendants point out, even if the proposed Medical Monitoring Class is only ten thousand people, the jurisdictional amount is reached provided that medical monitoring costs exceed $500 per person.  Given that Plaintiffs

assert that the plaintiff class will need to undergo periodic exams, screening multiple systems for multiple potential injuries, the Court has no trouble in finding, even before considering Plaintiffs's request for remediation, that the amount in controversy exceeds five million dollars. Therefore, the Court has jurisdiction over this case pursuant to CAFA.

### A.  Local Controversy Exception

In an exception "designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state," *Hart v. FedEx Ground Package System Inc.*  457 F.3d 675, 682 (7th Cir.2006), CAFA goes on to state:

> A district court shall decline to exercise jurisdiction under paragraph (2)--
>     (A)(i) over a class action in which--
>         (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
>         (II) at least 1 defendant is a defendant--
>             (aa) from whom significant relief is sought by members of the plaintiff class;
>             (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
>             (cc) who is a citizen of the State in which the action was originally filed; and
>         (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
>     (ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

28 U.S.C. § 1332(d)(4).

The plaintiff bears the burden of establishing that this so-called "local controversy" exception to federal jurisdiction applies.  *Hart*, 457 F.3d at 681 (7th Cir. 2006).  A district court must decline to exercise jurisdiction over a class action if a plaintiff establishes all of the

elements of the local controversy exception.

### 1. First Element - Local Plaintiffs

First, Plaintiffs must prove that the action is a class action in which greater than two-thirds of the "members of all proposed plaintiff classes in the aggregate are citizens of [Illinois]." 28 U.S.C. § 1332(d)(4)(A)(i)(I). Here, each of the proposed plaintiff classes encompasses only current citizens of Illinois. Accordingly, this action meets the first element of the local controversy exception.

### 2. Second Element - Significant Local Defendant

Next, Plaintiffs must prove that at least one of the non-diverse defendants, Cerro or the Sauget Defendants, is a defendant whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class and from whom significant relief is sought. Defendant Cerro argues that it is not a "significant defendant" for two reasons. First, Cerro argues that its alleged conduct does not form a significant basis for the claims asserted by the proposed plaintiff class because it has evidence that will disprove Plaintiffs's allegations that it scrapped PCB transformers. Furthermore, Cerro argues, it has evidence that will prove that its conduct in landfilling materials and draining manufacturing wastewater into Dead Creek did not result in the contamination of the surrounding environment with the hazardous substances actually named in the Complaint, that is, PCBs, dioxins, and furans. Plaintiffs point out that the Complaint alleges that Cerro contaminated the environment surrounding its plant with the named substances and "other hazardous substances." At any rate, the statutory language is clear: the Court must determine if Cerro's "*alleged* conduct forms a significant basis for the claims asserted by the proposed plaintiff class." 28 U.S.C. § 1332(d)(4)(A)(i)(II)(bb) (emphasis added).

Here, Plaintiffs allege, "As part of its copper recycling activity at the Cerro Facility,

Cerro has a) scrapped PCB transformers; b) drained manufacturing wastewater and PCB oil into Dead Creek Segment A located on the Cerro Facility; and c) landfilled Substances on the Cerro Facility, all of which activities caused releases of large quantities of Substances into the environment of the Affected Area." Whether Plaintiffs will be able to prove that Cerro acted as alleged, or whether Plaintiffs will be able to prove that Cerro was ultimately responsible for the alleged environmental contamination, is not an issue for the Court to decide at this juncture. The only question for the Court is whether the conduct of Cerro, as alleged by Plaintiffs, forms a significant basis for Plaintiffs's claims.

Cerro argues that the Court must compare the alleged conduct of Cerro with the alleged conduct of the Monsanto Defendants. As the alleged conduct of the Monsanto Defendants is, in Cerro's view, much worse that the conduct it is alleged to have engaged in, Cerro argues that it is not a significant defendant within the meaning of the statute. The Court rejects the argument that a defendant is only "significant" if its alleged conduct is as bad as or worse than the alleged conduct of its co-defendants. Rather, the Court finds Cerro to be a significant defendant because the allegations against it form the basis for a right to relief for most or all of the members of the proposed plaintiff class.

In determining the proper interpretation of a statutory provision, the Court must view the provision in the context of the statute as a whole. *See Dolan v. U.S. Postal Service*, 546 U.S. 481 (2006). Here, the statute establishes that an action may qualify for the local controversy exception in two ways. First, as relied on by Plaintiffs in this case, a controversy may be local if one or more "significant" defendants are non-diverse citizens. 28 U.S.C. § 1332(d)(4)(A). Second, a controversy may be local if one or more "primary" defendants are non-diverse citizens. 28 U.S.C. § 133 (d)(4)(B). Clearly, then, one need not be a "primary" defendant in

order to be a "significant" defendant. Cerro's argument conflates the two. It argues that it is not a significant defendant because more culpable actions are attributable to the Monsanto Defendants than to it. Whether or not this is the proper test to determine when one is a "primary" defendant, it is not the test for whether one is a "significant" defendant.

Instead of comparing Cerro's conduct to the Monsanto Defendants's conduct, the Court must compare Cerro's conduct with the conduct that forms the basis of the Complaint as a whole. The holding in the case primarily relied on by Cerro, *Evans v. Walter Industries, Inc.*, 449 F.3d 1159 (11th Cir.2006), comports with the Court's interpretation. In *Evans*, the Eleventh Circuit held that the plaintiffs had not established that U.S. Pipe was a significant defendant because the allegations against it would establish a right to relief against it for only a small portion of the plaintiff class as a whole. *Evans*, 449 F.3d at 1167-68. By contrast, here, the allegations against Cerro would, if proven, establish a right to relief for most, if not all, of the proposed plaintiff classes.

The Court notes that the legislative history of CAFA supports the Court's interpretation as well. *See Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546 (2005) (recognizing that courts may occasionally resort to the use of legislative history in order to determine whether they have correctly interpreted ambiguous statutory text). The Senate Committee Report accompanying the passage of CAFA clarifies that in order to be a "significant" defendant, "the [local] defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class" viewed as a whole. SENATE REPORT NO. 109-14 S. REP. 109-14, 40; 2005 U.S.C.C.A.N. 3, 38 (2005).

The Senate Committee Report uses the example of an insurance agent alleged to be a

10

participant in a scheme implemented by the defendant company for which he works. *Id.* If only a small number of the members of the plaintiff class had contact with the agent, his conduct could not be said to form a significant basis for the claims asserted by the class as a whole. *Id.* Nor could the class as a whole seek relief from him. *Id.* Therefore, the agent could not be said to be a significant defendant, and the local controversy exception would then not apply. *Id.*

In contrast, here, the allegations against Cerro, that it contaminated the environment surrounding its facility causing damages to the surrounding property and health problems in those who lived nearby, are sufficient to support a right to relief for most or all of the proposed class members. In other words, had Plaintiffs brought this action only against Cerro, the classes proposed by Plaintiffs and the relief sought by Plaintiffs would remain almost unchanged. The Court has no trouble, then, concluding that Cerro is a defendant from whom significant relief is sought by members of the plaintiff class and whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class. 28 U.S.C. § 1332(d)(4)(A)(I)(ii)(aa) and (bb). As Cerro concedes it is a citizen of Illinois, the state in which the action was originally brought, 28 U.S.C. § 1332(d)(4)(A)(I)(ii)(cc), Plaintiffs have established the second element of the local controversy exception.[2]

### 3. Third Element - Local Injuries

Plaintiffs must next establish that this action is one "in which the principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the

---

[2]As the local controversy exception to CAFA requires the plaintiff to establish that any one defendant is a significant local defendant, it is unnecessary for the Court to reach a determination as to whether the Illinois Probate Act bars Plaintiffs's claims against the estate of Paul Sauget, thereby preventing the estate from being a significant defendant.

State in which the action was originally filed." 28 U.S.C. 1332(d)(4)(A)(i)(III). Here, the principal injuries are: 1) the contamination of the plaintiff class's real property, and 2) the plaintiff class's need to monitor their health for injuries resulting from exposure to the contaminants released by Defendants. Plaintiffs argue that all of the injuries of which they complain were incurred in Illinois. The Illinois property was, obviously, contaminated in Illinois. Likewise, the class members were exposed to the contaminated environment in Illinois.

The Monsanto Defendants counter that they "have been sued in a variety of other states for alleged releases of allegedly hazardous chemicals. By any standard that conduct is 'related' to the chemical releases alleged here." However, the mere fact that the Monsanto Defendants have been accused of similar conduct in other localities does not mean that conduct is somehow "related" to the conduct alleged in this action. The Monsanto Defendants appear to read the word "related" in part (i)(III) of the statute to mean the same thing as the word "similar" used in part (ii). But the Court must presume Congress used the word it intended to use. "A cardinal canon of statutory construction is that we must presume that a legislature says in a statute what it means and means in a statute what it says there." *U.S. v. Rosenbohm*, 564 F.3d 820, 823 (7th Cir. 2009). Therefore, Congress intended that the Court examine the conduct the Monsanto Defendants are alleged to have engaged in and any conduct related to that alleged conduct. The Court fails to see how allegations that the Monsanto Defendants spilled or dumped hazardous material in other locales is at all related to allegations that they spilled or dumped hazardous materials in Sauget, Illinois. Here, the alleged contamination of the Monsanto Facility and its surrounding environment caused plaintiffs to incur the principal injuries of which they complain. A look at CAFA's legislative history confirms the Court's analysis:

The third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, *a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion*, provided that the property damage was limited to residents in the vicinity of the plant.

SENATE REPORT NO. 109-14 S. REP. 109-14, 40, 2005 U.S.C.C.A.N. 3, 38 (2005)(emphasis added).

In short, the injuries alleged by Plaintiffs are exactly the sort Congress had in mind when it fashioned this element of the local controversy exception. Because the property allegedly harmed is located in Illinois, the people allegedly harmed lived in Illinois at the time of their exposure, and because the contamination resulting from Defendants's alleged actions was limited to Illinois, Plaintiffs have established this element of the local controversy exception.

### 4. Fourth Element - No Prior Class Actions Within Three Years

Finally, Plaintiffs must establish that "during the 3-year period preceding the filing of [the instant] class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons." 28 U.S.C. 1332(d)(4)(A)(ii). Plaintiffs's Complaint alleges that this element has been met. However, Defendants direct the Court's attention to a class action filed against the Monsanto Defendants, among others, in New York state court in March 2007 styled *Corlew v. General Electric*.

The factual allegations asserted against the Monsanto Defendants in the *Corlew* action are that they produced inherently dangerous products containing PCBs and distributed those products with inadequate or improper warnings. The *Corlew* plaintiffs further alleged that the Monsanto Defendants failed to discover how dangerous PCBs are, and to the extent they did

discover the dangers of PCBs, they failed to inform the users and consumers of those dangers. In contrast, the factual allegations at the core of the instant complaint are that the Monsanto Defendants improperly produced, stored, and disposed of hazardous substances, including PCBs.

"So what?" query Defendants, "In both cases, the gravamen of the Complaint is the release of PCBs into the environment." Certainly, this is what the plaintiffs in both cases complain happened as a result of the Monsanto Defendants's actions. However, the facts underlying each complaint are very different. In *Corlew*, the plaintiffs argued that Monsanto should not have produced and distributed its products; whereas the instant plaintiffs argue that Monsanto should have used greater care in producing and handling its products. This distinction is not as fine as it may seem. Essentially, the *Corlew* plaintiffs complain that products containing PCBs were produced and distributed at all, because those products are inherently dangerous. The plaintiffs in the instant case, however, complain about the improper handling - in essence the spilling - of the Monsanto products. Boiled down, the *Corlew* action says, "Don't produce;" the instant action says, "Don't spill."

Furthermore, even if the *Corlew* action and the instant action alleged that the Monsanto Defendants had contaminated the environment in the same way, the fact that the actions concern the contamination of different environments is enough to differentiate the two. An action alleging the contamination of real property in Illinois could never be consolidated or coordinated with an action alleging the contamination of real property in another locale. This is a good indication that the two actions do not "assert[] the same or similar factual allegations" within the meaning of the statute. Therefore, the Court finds that Plaintiffs have established this element as well.

In conclusion, as Plaintiffs have established all the elements of the local controversy exception to CAFA jurisdiction, the Court must remand this action unless there is another basis for federal jurisdiction. The Monsanto Defendants assert that there is. They contend that this case is removable under 28 U.S.C. § 1442(a)(1), federal officer removal.

## II.     Federal Officer Jurisdiction

"28 U.S.C. § 1442(a)(1) [] says that 'any person acting under' a federal officer may remove a suit that depends on the defendant's following the directions issued by that federal officer." *Pollitt v. Health Care Service Corp.*, 558 F.3d 615, 616 (7th Cir. 2009) (*citing Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007)). Section 1442(a)(1) authorizes removal of an entire case, even though only one of its controversies might involve a federal officer or agency. *See State of N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc.*, 719 F.Supp. 325, 334 (D.N.J.1989); 14C Wright, Miller, Cooper & Steinman, Federal Practice & Procedure § 3727. "The purpose of the removal statute is to insure a federal forum for cases where federal officials must raise defenses arising out of their official duties." *Wisconsin v. Schaffer*, 565 F.2d 961, 964 (7th Cir. 1977).

The statute permits removal by any person, but only if that person acted under the direction of a federal agency or officer when "carrying out the acts that are the subject of the [plaintiffs's] complaint." *Watson*, 551 U.S. 142, 127 S.Ct. 2301, 2304-5 (2007). The defendant seeking federal officer removal must satisfy a three-part test. First, the defendant must be a "person" within the meaning of the statute. Second, the defendant must raise a colorable federal defense to the plaintiff's claims. Finally, there must be a causal nexus between the plaintiff's claims and the acts the defendant performed at the federal officer's direction. *See, Jefferson*

*County, Ala v. Acker,* 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 139,(1989).
As the party asserting federal jurisdiction, the Monsanto Defendants bear the burden of proving
that all the elements of federal officer removal are met. *See Disher v. Citigroup Global Mkts.
Inc.*, 419 F.3d 649, 654 (7th Cir.2005).

### A.    First Element - Person within Meaning of Statute

The weight of authority holds that corporations are persons within the meaning of 28
U.S.C. § 1442. *Alsup v. 3-Day Clinds, Inc.*, 435 F.Supp. 2d 838 n.3 (S.D.Ill. 2006) (collecting
cases). Therefore, the Court finds that the Monsanto Corporate Defendants are persons within
the meaning of the statute. The Monsanto Defendants have proved the first part of the three-part
test.

### B.    Second Element - Colorable Federal Defense

Next, the Monsanto Defendants must establish that they have a colorable federal defense
to their actions. The Monsanto Defendants point to three possible federal defenses: the
government contractor defense, the Defense Production Act, and the Toxic Control Substances
Act.

### 1.    Government Contractor Defense

The government contractor defense is a defense to some products liability actions. *See
Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). It is available when "a 'significant
conflict' exists between an identifiable 'federal policy or interest and the operation of state law,'
or the application of state law would 'frustrate specific objectives' of federal legislation." *Id*. at
507. The defense is asserted by defendants who perform government contracts to the

specifications called for by the federal government when those specifications caused the defendants to be unable to comply with state law. *See id*. at 509. "If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest." *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989).

Here, Plaintiffs do not assert that the Monsanto Defendants produced a flawed product. Rather, they assert that the Monsanto Defendants produced, stored and disposed of their products in a shoddy manner that resulted in leaks and spills of hazardous substances. This case is, therefore, inapposite to the Agent Orange cases cited by Defendants. *See, e.g. In re "Agent Orange" Product Liability Litigation*, 304 F.Supp.2d 404 (E.D.N.Y. 2004). In those cases, the government had specified the chemical composition of the products to be manufactured after making the policy decision to maximize the herbicidal effect of the chemical in spite of the safety implications of doing so. *Id.* at 449-50. Therefore, the case involved an identifiable federal policy, that is, military effectiveness. In contrast, here, Defendants have pointed to no federal interest that is implicated by requiring them to handle and dispose of their products with care. Nor have they articulated any government requirement that prevented them from doing so. Accordingly, the Monsanto Defendants do not present a colorable government contractor defense.

## 2.      Defense Production Act

In relevant part, the Defense Production Act provides: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act." 50 U.S.C. § 2157. Despite being

challenged by Plaintiffs to do so, Defendants have pointed to no "rule, regulation, or order issued

pursuant to [the] Act" compliance with which has exposed them to liability. Instead, Defendants

merely assert that they need not prove they will prevail on their asserted defense. However, it is

Defendants's burden to show they have a *colorable* federal defense. Although they need not

prove they will prevail on the defense, they at least have to show that they are entitled to raise it.

Defendants here have made no such showing.

### 3.      Toxic Substances Control Act

Finally, the Monsanto Defendants contend that this action is preempted by the Toxic

Substances Control Act. Subject to certain exceptions, the Toxic Substances Control Act

provides that once the EPA has

> prescribe[d] a rule or order. . . which is applicable to a chemical substance or
> mixture, and which is designed to protect against a risk of injury to health or the
> environment associated with such substance or mixture, no State or political
> subdivision of a State may. . . establish or continue in effect, any requirement
> which is applicable to such substance or mixture, or an article containing such
> substance or mixture, and which is designed to protect against such risk unless
> such requirement (i) is identical to the requirement prescribed by the
> Administrator, (ii) is adopted under the authority of the Clean Air Act [42
> U.S.C.A. § 7401 et seq.] or any other Federal law, or (iii) prohibits the use of such
> substance or mixture in such State or political subdivision (other than its use in
> the manufacture or processing of other substances or mixtures).

15 U.S.C. § 2617

A state "requirement" may take the form of a common law suit for damages. *Cippollone*

*v. Liggett Group, Inc*., 505 U.S. 504, 521 (1992). The EPA has enacted regulations regarding the

manufacturing, processing, distribution in commerce, storage, and disposal of PCBs. 40 C.F.R.

§§ 761 *et seq*. A showing by the Monsanto Defendants that they have complied with those

regulations may provide them a defense to Plaintiffs's action. Thus, the Court finds that the

Monsanto Defendants have presented a colorable federal defense to at least some of the claims

against them.

However, under the well pleaded complaint rule, the mere availability of a federal defense does not provide the Court an independent basis for jurisdiction. *Arkansas v. Kansas & T. Coal Co.*, 183 U.S. 185, 188 (1901). Therefore, the Court does not have jurisdiction pursuant to 28 U.S.C. § 1441 over this action merely because the Defendants may raise the Toxic Substances Control Act as a defense. *Chappell v. SCA Services, Inc.*, 540 F.Supp 1087, 1095-95 (D.C. Ill. 1982). Instead, the Monsanto Defendants must meet the third element of federal officer removal, 28 U.S.C. § 1442, in order to establish that the Court has jurisdiction over this action.

### C. Third Element - Government's Direction Caused Defendant's Acts

The defendant must establish that there is causal connection between the plaintiff's claims and the acts the defendant performed at the federal officer's direction. "[A] removing defendant must show that at all times it was acting under express orders, control and directions of federal officers, and that its involvement in conduct giving rise to state-court liability was strictly and solely at federal behest." *Alsup*, 435 F.Supp.2d at 846. "By contrast, a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal office or officer is not entitled to section 1442(a)(1) removal." *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934 (E.D.N.Y. 1992). Here, the Monsanto Defendants claim that the Government directed them to produce Agent Orange and PCBs and that the Government directed them to dispose of hazardous waste at the Sauget Landfill during World War II.

### 1. Production of Agent Orange

As the Monsanto Defendants point out, numerous prior suits have established that Agent Orange was produced to "the detailed specifications" of the federal government "concerning the

makeup, packaging, and delivery" of the herbicide.  *See, e.g. Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998); *"Agent Orange"*, 304 F.Supp.2d 404.  However, the cases cited by the Monsanto Defendants were all products liabilities cases involving claims that the defendant companies had manufactured an unreasonably dangerous product.  In contrast, Plaintiffs's claims arise from the handling, storage, and disposal of Defendants's products, including Agent Orange.  Again, Plaintiffs complain, not that Monsanto produced these hazardous substances, but that they, essentially, spilled them.  The Monsanto Defendants have not directed this Court to any evidence suggesting that the federal government directed them to act in any of the ways alleged by Plaintiffs to have caused them harm.  That is, the federal government did not direct the Monsanto Defendants to "spill" or "incompletely incinerate" or "improperly burn" or "discharge into surface or wastewater systems" or "improperly landfill" Agent Orange or any other hazardous substance.  Therefore, the fact that they produced Agent Orange to government specifications does not establish that the federal government directed them to perform the acts that form the basis for the liability claimed here.

### 2.    Production of PCBs

The Monsanto Defendants contend that they were directed to produce PCBs at the behest of the federal government via a 1972 report by the Interdepartmental Task Force on PCBs entitled "Polychlorinated Biphenyls and the Environment."  The Report was the product of a six month review of PCBs by five federal agencies.  One of the Report's conclusions, the one relied on by the Monsanto Defendants, was that "the use of PCBs should not be banned entirely."  The Monsanto Defendants claim that the Report thus "prove[s] that it is being sued for something the federal government told it to do."  The Court cannot agree.  The Monsanto Defendants were not banned by the federal government from continuing to produce PCBs; that is a far cry from being

20

directed by the federal government to continue to produce PCBs. Furthermore, once again, the Monsanto Defendants are not being sued for producing PCBs, but for mishandling PCBs. The Monsanto Defendants have pointed to no federal direction as to how they were to handle the PCBs they produced. Therefore, the Monsanto Defendants have not established that their production of PCBs was either directed by the federal government or forms the basis for the liability claimed here.

### 3.    Waste Disposal From the CWS Plant

Finally, the Monsanto Defendants assert that they were directed by the United States War Department to dispose of some of the hazardous substances that were produced at the CWS plant and that are the subject of this lawsuit by placing them in dumpsters and dumping them in the Sauget Landfill. They point to the deposition testimony, taken in an unrelated case, of Charles McDonnell, a Monsanto employee who worked at the CWS plant north of the W.G. Krummrich plant for roughly 18 months beginning in the latter part of 1943. Mr. McDonnell testified that he had no personal knowledge of the arrangement between CWS and Monsanto, but that he knew that "Uncle" was in charge of the "whole shebang." Mr. McDonnell also testified as to exactly how the Monsanto employees working at the CWS Plant disposed of the hazardous waste produced there. He testified that hazardous substances would be washed down the sewer or dumped into the Sauget Landfill.

In addition to Mr. McDonnell's testimony, the Monsanto Defendants point to the deposition testimony, taken in the same unrelated case, of Ernest Mares, an industrial chemist with Monsanto who was in charge of the manufacturing operations of the CWS plant for approximately three and a half years during World War II. Mr. Mares testified that Monsanto was in charge of "the actual, basic operation of the plant," but that "[t]he oversight was made by

the military."

The Monsanto Defendants contend that, taken together, Mr. Mares's and Mr. McDonnell's testimony established that Monsanto was directed by the military to dispose of the hazardous substances produced at the CWS Plant in the manner in which it did. However, the testimony of these two gentlemen merely establishes that "the relevant acts occurred under the general auspices of" the War Department. They have pointed to no evidence to prove that a federal agency or officer directed them to carry out the acts that are the subject of Plaintiffs's complaint. Therefore, the Monsanto Defendants have failed to establish that there is causal connection between Plaintiffs's claims and the acts they performed at the federal officer's direction. As they have failed to prove this final element of the federal officer removal test, the Monsanto Defendants have failed to establish that the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1442.

## CONCLUSION

Because the Court does not have jurisdiction over this action pursuant to 28 U.S.C. § 1442, and because it must decline to exercise its jurisdiction under CAFA, the Court **GRANTS** Plaintiffs's Motion (Doc. 21) and **REMANDS** this action to the Circuit Court of St. Clair County, Illinois. The Court **DENIES** the Motion for Oral Argument (Doc. 35).

**IT IS SO ORDERED.**
**DATED: July 30, 2009**

<u>s/ J. Phil Gilbert</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**